**IN THE COURT OF APPEALS OF IOWA**

No. 25-0113
Filed April 23, 2025

**IN THE INTEREST OF L.B. and H.B.,**
**Minor Children,**

**J.L., Father,**
    Appellant,

**L.B., Mother,**
    Appellant.
_____


Appeal from the Iowa District Court for Story County, Hunter W. Thorpe, Judge.


A mother and father separately appeal the juvenile court's ruling terminating their parental rights. **AFFIRMED ON BOTH APPEALS.**


James W. Thornton of Thornton & Coy, PLLC, Ankeny, for appellant father.

T.J. Hier of Hier Law Office, P.C., Baxter, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Shannon M. Leighty of Public Defenders Office, Nevada, attorney and guardian ad litem for minor children.


Considered without oral argument by Greer, P.J., and Langholz and Sandy, JJ.

**SANDY, Judge.**

A mother and father separately appeal the juvenile court order terminating their respective parental rights to their two minor children. Although the mother and father appeal separately, they make identical arguments on appeal. The mother and father contend that: (1) several permissive exceptions to termination should have been applied; (2) an extension of time to work towards reunification should have been granted; (3) placing the children under the guardianship of their paternal grandparents was more appropriate than termination; and (4) the juvenile court erred by not bifurcating the role of the children's guardian ad litem (GAL) and attorney.

Upon our de novo review of the record, we affirm.

**I. Background Facts and Proceedings**

Mother and father are the parents of H.B. and L.B. H.B. was born in 2012, while L.B. was born in 2014. The family has an extensive history with the Iowa Department of Health and Human Services (HHS) dating back to 2016. Historically, there have been concerns that the mother and father have regularly used methamphetamine while caring for the children. Both the mother and father have founded child abuse reports against them.

The family again came to the attention of HHS in May 2023, after HHS received reports the mother and father were again using methamphetamine while caring for the children, the children frequently were witnessing domestic violence between the mother and father, and there was a lack of food in the parental home. The record also shows the mother and father were in the process of being evicted around this time.

HHS filed an application for temporary removal with the juvenile court on May 16. The juvenile court granted the application and ordered the children to be placed in the temporary custody of HHS for purposes of relative placement. The children were subsequently placed with their paternal grandparents. The State then filed child-in-need-of-assistance (CINA) petitions for the children. The mother and father both stipulated that the children were in need of assistance. Due to the parents' stipulations, the children were adjudicated in need of assistance and placed in the custody of HHS for purposes of placement with their paternal grandparents. The children remained in their paternal grandparents' care throughout these proceedings.

Following their removal, the children disclosed they had frequently witnessed the mother and father use illicit substances while in their custody. According to H.B., she once witnessed the father "smoke from a pipe which she described and drew to resemble" a methamphetamine pipe. Additionally, the children reported witnessing the mother and father "swear at each other, accusing each other about making out with other people, having constant arguments with each other, and displaying physical violence towards each other." The children have also reported intervening between the mother and father because "they were afraid of the neighbors hearing them scream and fight." H.B. and L.B. have had to receive therapy due to the trauma they experienced while in the custody of the mother and father. H.B. has been diagnosed with "adjustment disorder with mixed anxious and depressed mood" and PTSD. L.B. has been diagnosed with "adjustment disorder with anxiety."

Throughout the underlying CINA case, HHS expressed concerns over the mother and father's substance use, mental health, and history of domestic violence.[1]  The mother has consistently maintained that she has not used methamphetamine since 2016.  But Megan Matias—the HHS case manager assigned to the family—testified at the termination hearing HHS continuously received reports from "other family, law enforcement, [and] within the schools" that the mother was possibly still using methamphetamine.  Despite numerous court orders to do so, the mother never complied with HHS's drug testing requests.  The record shows HHS requested the mother to drug test eleven times.

To her credit, the mother did obtain two substance-use evaluations.  The evaluations recommended no treatment for substance use.  However, as Matias explained at the termination hearing, this was not necessarily surprising because substance-use evaluations rely heavily on information supplied by the individual being evaluated.  As Matias testified at the termination hearing, "[i]t's all self-reported, so use hasn't been since 2016, there's going to be no recommendations."  Matias later added, "it's hard to accurately portray her sobriety, when, again, drug screens aren't being . . . requested or are being requested by the Department and it's all self-reported."

As for her mental health, the mother did a much better job of addressing HHS's concerns.  Reports provided by HHS disclose the mother had a previous

[1] Despite having concerns over the history of domestic violence in the mother and father's relationship, it does not appear HHS recommended services specifically targeted at addressing domestic violence.  Of note, there was a no-contact order in place between the mother and father in 2018 due to a physical altercation between them.  After this altercation, the mother was seen with "injuries present on her face from the altercation."

diagnosis of bipolar disorder. The mother also later obtained a mental-health evaluation, which diagnosed her with PTSD. Following her mental-health evaluation, the mother participated in individual therapy. According to Matias, the mother was "pretty consistent with her mental health therapy." In September 2024, HHS received a report from the mother's therapist that she had been successfully discharged from treatment.

The father did virtually nothing to address concerns with substance use and his mental health throughout this case. When asked by HHS about his history of substance use at the beginning of the case, the father denied any history of use. However, the record establishes the father started using substances when he was fifteen years old. Additionally, HHS reports establish the father was previously admitted into a residential treatment facility in Cedar Rapids for using "methamphetamine, opiates, heroin, and ecstasy." Prior to his admittance to the residential treatment facility, the father had been unsuccessfully discharged from outpatient substance-use treatment.

Despite court orders to do so, the father never drug tested for HHS or obtained a substance-use evaluation. HHS requested the father to drug test nine times throughout this case. According to Matias, the father told HHS he "did not need to complete a substance-[use] evaluation" because he hadn't used methamphetamine for two years. But in September 2024, just three months prior to the termination hearing, the father was arrested for his involvement in a high-speed motorcycle chase. After the father was apprehended by a state trooper, he admitted "he attempted to elude law enforcement because he had a suspended driver's license and was in possession of methamphetamine." The father had

approximately five grams of methamphetamine in the front pocket of his jeans, and he admitted to using methamphetamine earlier that day.[2]

Additionally, the father has a long history of struggles with mental health. According to HHS reports, the father has had previous diagnoses for bipolar disorder and drug-induced schizophrenia. In December 2017, the mother reported the father had a "psychotic episode" in which he accused her of having an affair with his best friend. According to the mother, the father "was out of touch with reality." The father was eventually committed to a "mental health inpatient facility at St. Anthony's in Carroll for 8 days." However, he "did not complete [the] necessary steps with continuing outpatient mental health treatment or continue to take his medications after being released." HHS has also received reports that the father previously attempted to commit suicide multiple times by hanging himself in front of the children and other family members. However, family members were able to step in and stop the father. In one instance the father hung a mannequin from a ceiling fan in the children's bedroom so when they woke, they would think their father hanged himself. The father went on to explain that he did that as a prank to "toughen" them up for when he did commit suicide. Of note, the mother and father remain together to this day.

Notwithstanding the father's history of struggles with his mental health, he did not obtain a mental-health evaluation until November 2024—one month prior

---

[2] For his involvement in the high-speed chase, the father was arrested and charged with eluding a pursuing law enforcement vehicle, exceeding the speed limit by twenty-five miles per hour or more; possession of a controlled substance, third or subsequent offense; and operating while intoxicated, first offense. At the time of the termination hearing, the father was out on bond and awaiting a preliminary hearing on these charges.

to the termination hearing. The mental-health evaluation diagnosed the father with adjustment disorder and indicated he had agreed to participate in individual therapy services. However, Matias testified at the termination hearing that HHS did not have knowledge of whether the father attended any therapy sessions following the mental-health evaluation. Prior to obtaining a mental-health evaluation, the father had not engaged in any services to address his mental health.

Due to the parents' failure to make meaningful progress towards the goal of reunification, the State filed a petition to terminate their parental rights. A termination hearing was held in December 2024. During the hearing, the juvenile court heard extensive testimony from the mother, the father, and Matias. The mother and father both testified that they were currently living together and in a relationship. They each acknowledged it would not be in the children's best interests to be returned to their custody at the time of the hearing. However, in their testimony, the mother and father asserted the children were against termination and did not want to be adopted by their paternal grandparents.

In her testimony, Matias explained that the mother and father "haven't acknowledged why we've been involved this entire case." She added, "I would say none of the services or the problems that came into the Department have been appropriately addressed." Additionally, Matias testified the children wanted to remain placed with their paternal grandparents and that "[t]hey're in agreeance to termination." The children's GAL and attorney—Shannon Leighty—also informed the juvenile court during the hearing that the children were in favor of termination. However, Leighty stated to the juvenile court, "it's one of those things that the only

issue that H.B. has is she does not want to be adopted. The other issue she stands by, she is wanting to remain with [her paternal grandparents] and believes that's also best for L.B. as well."

Following the termination hearing, the juvenile court issued its ruling terminating the mother and father's parental rights to L.B. and H.B. pursuant to Iowa Code section 232.116(e) and (f) (2024).

These appeals followed.

## II. Standard of Review

"We review termination of parental rights de novo." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re C.Z.*, 956 N.W.2d 113, 120 (Iowa 2021) (citation omitted). "As always, our fundamental concern is the child's best interests." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014).

## III. Analysis

We employ a three-step analysis to review the termination of parental rights. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). "The first step is to determine whether any ground for termination under section 232.116(1) has been established." *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). If a statutory ground for termination has been established by clear and convincing evidence, "then we determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights." *Id.* at 219–20. Finally, if we determine the best-interest framework supports termination of parental rights, "we consider whether any exceptions in section 232.116(3) apply to preclude termination." *Id.*

at 220. "However, if a parent does not challenge a step in our analysis, we need not address it." *In re J.P.*, No. 19-1633, 2020 WL 110425, at *1 (Iowa Ct. App. Jan 9, 2020).

In this appeal, we address the mother and father's claims related to the three-step termination analysis, requests for extensions of time to work toward reunification, and requests for establishment of a guardianship separately. However, we address their arguments related to bifurcation of the roles of the children's GAL and attorney together.

**A. Mother's Appeal**

*1. Permissive Exceptions to Termination[3]*

Regarding the three-step termination analysis, the mother only contends that the juvenile court erred by not applying several permissive exceptions to termination. She argues the permissive exception provided for in Iowa Code section 232.116(3)(a) should have been applied by the juvenile court because "H.B. and L.B. have been placed with a relative for the entirety of this case." Additionally, she believes the exception to termination under paragraph (b) should have been applied because she contends the children objected to termination. She also argues the exception under paragraph (c) should have been applied because of her close bond with the children. We disagree on each point and conclude the juvenile court did not err by declining to apply a permissive exception.

---

[3] In her petition, the mother briefly mentions that termination was not in the children's best interests in a heading. However, the mother failed to further develop an argument on this issue. Thus, we deem she has waived any claim that termination was not in the children's best interests. *See In re Q.B.*, No. 23-2112, 2024 WL 707194, at *2 (Iowa Ct. App. Feb. 21, 2024) (noting "cursory references" to an issue are insufficient to raise the issue on appeal).

"[O]nce the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination." *In re W.T.*, 967 N.W.2d 315, 322 (Iowa 2021) (citation omitted). "The [exceptions] weighing against termination in section 232.116(3) are permissive, not mandatory." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (citation omitted). "The court has discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the [exceptions] in this section to save the parent-child relationship." *In re D.S.*, 806 N.W.2d 458, 475 (Iowa Ct. App. 2011).

Iowa Code section 232.116(3)(a) provides that a court may forgo termination if "[a] relative has legal custody of the child." The mother believes this exception to termination applies because the children have been placed in the care of their paternal grandparents. However, placement and legal custody are two very different things. At all times, the children have been in the custody of HHS for purposes of placement with the paternal grandparents. At no time have the children been in the legal custody of the paternal grandparents. Thus, this exception is inapplicable. *See In re A.B.*, 956 N.W.2d 162, 170 (Iowa 2021) ("But this exception can come into play only when a relative has 'legal custody.'" (citation omitted)).

Moving on to the second exception urged by the mother, paragraph (b) of the same subsection provides that the court may decline to terminate parental rights if "[t]he child is over ten years of age and objects to termination." Iowa Code § 232.116(3)(b). As a starting point, we note there is some tension in our case law regarding whether this exception would be applicable to L.B., who was ten years old at the time of the termination hearing. *Compare In re A.D.*, No. 20-1182, 2020

WL 7022391, at *3 n.6 (Iowa Ct. App. Nov. 30, 2020) ("[S]ection 232.116(3)(b) provides that the court need not terminate when a child 'is *over ten years* of age' and objects." (citation omitted)), *with In re D.M.*, No. 24-1981, 2025 WL 548368, at *3 (Iowa Ct. App. Feb. 19, 2025 (analyzing the application of the exception under section 232.116(3)(b) for a child who was ten years old at the time of the termination hearing and objected to termination).

However, we need not definitively resolve this tension today. Because even assuming the exception under section 232.116(3)(b) could be applied to L.B., we conclude there is scant evidence she objected to termination. Matias and Leighty both informed the juvenile court that the children were in favor of termination at the hearing. The only evidence L.B. objected to termination came from the testimony of the mother and father. But the juvenile court explicitly found their testimony to be lacking in credibility. *See C.Z.*, 956 N.W.2d at 113. Thus, the mother has not carried her burden to show this exception should have been applied.

As for H.B., there is also little evidence she objected to termination. Leighty and Matias asserted during the termination hearing that they had recently spoken with H.B., and she had informed them she was in support of termination. Additionally, the juvenile court wrote in its thorough ruling, "[d]uring a recess on the day of the hearing, the GAL spoke with [H.B.] to ensure this was her position and even inquired of her in the presence of the court where the child nodded in acknowledgement of her support of termination."[4] Of note, however, Leighty also

---

[4] We make note that, but for the district associate judge including this observation in his written ruling, there would be no record of the child nodding. That is because the record was made by audio recording not a live court reporter. Machines don't pick up head nods. This is one of many reasons that we have advocated for the

informed the court that H.B. could be "emotional" and did vacillate over wanting to be adopted or not wanting to be adopted by the paternal grandparents. On this record, we cannot be sure how the distinction between termination and adoption was explained to H.B., but we note a report submitted shortly before the hearing by the court appointed special advocate stated H.B. "wants to be adopted by [her paternal grandparents] and live with them for the rest of her childhood." And there was testimony at the termination hearing that the paternal grandparents were a pre-adoptive home for the children. And while adoption is not the only option to help children achieve permanency, even with the child's hesitation over the issue, our focus is to avoid placing children in limbo and to find a permanent placement. See Iowa Code 232.117(6) (after termination a case permanency plan is required to establish a stable placement by adoption or other permanent placement; to include a reports about why adoption would not be in the children's best interests). Thus, we note the child's hesitation, but our focus is on permanency and the child's best interests.

The only evidence that H.B. objected to termination came from the testimony of the mother and father. But as mentioned above, the juvenile court expressly found the mother and father's testimony to be lacking in credibility. And we defer for pragmatic reasons to the juvenile court's witness credibility determinations. *See C.Z.*, 956 N.W.2d at 120. Consequently, the mother has not carried her burden to establish this exception should have been applied as to H.B.

---

vital importance of live court reporters. This example is but one illustration of the such.

Lastly, the mother contends the juvenile court should not have terminated her parental rights due to her close bond with the children. It is well-established that the juvenile court may decline to terminate a parent's parental rights if "[t]here is clear and convincing evidence that termination would be detrimental to the child due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). However, a bond between a parent and child alone is insufficient to apply this exception. *See In re R.P.*, No. 23-0419, 2023 WL 3612412, at *2 (Iowa Ct. App. May 4, 2023) ("[T]he existence of a bond is not enough. To apply the permissive exception to termination based on the parent-child bond, the mother must prove that termination would be detrimental to the child [due] to that bond." (internal citation omitted)). Here, there is scant evidence that termination would be detrimental to either child due to the closeness of their bonds with the mother. While in the custody of the mother, the children were subjected to significant trauma and instability. In contrast, the children have thrived and been afforded a stable home while placed with their paternal grandparents. And the evidence shows the children wish to remain with their paternal grandparents. Thus, we believe the juvenile court properly declined to apply this exception.

*2. Six-Month Extension*

Additionally, the mother contends the juvenile court erred in denying her request for a six-month extension to work toward reunification. In support of her argument on this point, the mother notes she obtained two substance-use evaluations and stated she would comply with future drug testing requests from HHS during the termination hearing. She argues "[i]f the Court had granted a six-month extension of time, it is very likely the children could have been returned" to

her. However, we conclude the juvenile court did not err in denying the mother's request for an extension of time.

The juvenile court may grant a parent an extension of time to work toward reunification if the court determines "that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005) (quoting Iowa Code § 232.104(2)(b)). To grant an extension, the juvenile court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis" for its determination that the need for removal will no longer exist after the additional period of time. Iowa Code § 232.104(2)(b). "The judge considering [an extension] should however constantly bear in mind that, if the plan fails, all extended time must be subtracted from an already shortened life for the children in a better home." *In re A.C.*, 415 N.W.2d 609, 614 (Iowa 1987).

In finding the mother's request for an extension of time to work toward reunification was not warranted, the juvenile court wrote:

> As with the permanency hearing, the record lacks support showing an extension would put the parents in a place where the need for removal would no longer be present if the court granted an extension. The children have already been removed from the care of the parents for nineteen months in this case. When looked at in the light of the parents' progress thus far, it is highly unlikely the need for removal will not exist in six months, at which point the child[ren] will have been removed for over two years. The parents' history indicates additional time would likely put the court in a position where it is deferring this decision all while depriving the children of a permanent and safe home. It is simply not in the child[ren's] best interest to continue to wait for the parents to get their act together.

We agree with the juvenile court that an extension of time for the mother is not warranted. While the mother made some strides in addressing HHS's concerns—

such as addressing her mental health—she failed to take concerns over her history with substance use seriously. Although the mother testified at the termination hearing that she had not used methamphetamine since 2016, we note the juvenile court found her testimony to be lacking in credibility. Based off the facts of this case, we see no reason to disturb this finding. *See C.Z.*, 956 N.W.2d at 120.

And despite the mother's claims of sobriety, HHS continued to receive reports that she was likely still using methamphetamine. The mother also failed to comply with a single drug test request throughout nineteen months, which we can presume would have resulted in positive tests for methamphetamine. *See In re I.J.*, No. 20-0036, 2020 WL 1550702, at *2 (Iowa Ct. App. Apr. 1, 2020) ("We presume these missed drug tests would have resulted in positive tests."). Bottom line, with concerns the mother is still actively using methamphetamine, we cannot find that the need for removal will no longer exist after an additional six months. *See J.P.*, 2020 WL 110425, at *2 ("A parent's methamphetamine use, in itself, creates a dangerous environment for children.").

*3. Guardianship*

The mother also asserts the juvenile court erred by not establishing a guardianship of the children with the paternal grandparents. However, the mother only makes passing references to this argument in her petition and does not support it with any citation to legal authority. Consequently, we conclude the mother has waived this argument. *See In re J.R.*, No. 22-1470, 2023 WL 2148760, at *3 (Iowa Ct. App. Feb. 22, 2023) ("We re-affirm that 'random mention of [an] issue, without elaboration or supportive authority, is insufficient to raise the issue for our consideration.'" (alteration in original) (citation omitted)). However, even

assuming that the mother had properly preserved this issue, for the reasons we articulate denial of the father's guardianship request below, we similarly deny the mother's request and adopt the same reasoning.

## B. Father's Appeal

### 1. Permissive Exceptions[5]

Within our three-step termination analysis, the father only asserts several permissive exceptions should have been applied. He argues the juvenile court should have declined to terminate his parental rights because the children were placed with his parents throughout the duration of this case. He also asserts the juvenile court should have applied the exception to termination under section 232.116(3)(b)—at least as to H.B.—because she objected to termination.[6] Lastly, he contends the juvenile court should have declined to terminate his parental rights because of his close bonds with the children. We disagree on each point.

As previously mentioned, the juvenile court has the discretion to forgo termination if "[a] relative has legal custody of the child[ren]." Iowa Code § 232.116(3)(a). However, as we mentioned earlier, the children have never been in the legal custody of a relative during this case. The children have only been

---

[5] Like the mother, the father briefly mentions in a heading in his petition that termination was not in the children's best interests. However, he does not develop this argument further in his petition. Consequently, we conclude he has waived this argument on appeal. *See Q.B.*, 2024 WL 707194, at *2.

[6] The father's petition only mentions H.B. when discussing the exception under section 232.116(3)(b). Because the father's argument in his petition does not mention L.B., we conclude he has waived this argument as to her. *See Lindaman v. Bode*, 478 N.W.2d 312, 317 (Iowa Ct. App. 1991) ("We consider arguments not raised on appeal to be waived.").

placed with the paternal grandparents, while legal custody remained with HHS. Consequently, this exception is inapplicable based on the facts of this case. *See A.B.*, 956 N.W.2d at 170.

Moving on, the juvenile court may decline to terminate parental rights if a child "is over ten years of age and objects to the termination." Iowa Code § 232.116(3)(b). The father asserts the evidence shows H.B., who was twelve at the time of the termination hearing, objected to termination. However, we disagree. Leighty and Matias both represented to the juvenile court that they had spoken with H.B. recently, and she had told them she was in favor of termination. In fact, Leighty asked H.B. if she was in favor of termination in the presence of the juvenile court and she nodded affirmatively. But Leighty did inform the juvenile court that H.B. did not want to be adopted. Although adoption is often the preferrable outcome in termination of parental rights cases, it is not required to terminate parental rights. *See T.C.*, 522 N.W.2d at 109.

The only evidence suggesting H.B. objected to termination came from the testimony of the mother and father. However, we note the juvenile court found their testimony to be lacking in credibility. We defer to the juvenile court's witness credibility determinations. *See C.Z.*, 956 N.W.2d at 120. Accordingly, the father has not carried his burden to show this exception was applicable.

Finally, the father argues the juvenile court should not have terminated his parental rights due to the close bonds he shares with the children. The juvenile court may decline to terminate a parent's parental rights if there "is clear and convincing evidence that the termination would be detrimental to the child at the time due to closeness of the parent-child relationship." Iowa Code § 232.116(3)(c).

The father claims there is clear and convincing evidence of close bonds between himself and the children because visits throughout the case went well with the children. However, for this exception to apply, the father must do more than just show that bonds with the children exist. He must *also* show that termination would be detrimental to the children due to the close bonds with the children. *See R.P.*, 2023 WL 3612412, at *2. That evidence is lacking here. Instead, the evidence shows the children have been subjected to significant trauma and instability while in the father's custody. Conversely, with the paternal grandparents, the children have been afforded a stable, loving home where their needs are being fully met. The father has not carried his burden to establish this exception should have been applied.

*2. Six-Month Extension*

Additionally, the father asserts the juvenile court should have granted his request for an extension of time to work toward reunification. In support of this argument, the father notes he "participated in FCS supervised visits during the term of this case and all reports indicated that he was appropriate with the children." He adds, "[a]t the time of the trial, [he] was employed and had a home where the children could be returned. He was in the process of getting a substance abuse assessment done and was going to start treatment." We disagree that the juvenile court erred by declining to grant a six-month extension of time.

The juvenile court has discretion to grant a parent's request for an extension of time to work toward reunification if the court determines "that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *A.A.G.*, 708 N.W.2d at 92 (quoting Iowa Code

§ 232.104(2)(b)).  In order to grant an extension, the juvenile court must be able to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis" for a finding that the need for removal will no longer exist after an additional six months.  Iowa Code § 232.104(2)(b).

Here, there is little we can point to in the record that would support an extension of time for the father.  The father has done nothing to address concerns over his substance use.  He never obtained a substance-use evaluation, and he did not comply with any drug testing requests from HHS.  We presume his missed tests would have resulted in positive tests for illegal substances.  *See I.J.*, 2020 WL 155072, at *2.  Furthermore, the father relapsed with methamphetamine three months prior to the termination hearing.  Based on the father's history in this case, we cannot say the need for removal will not exist after an additional six months.  *See In re A.G.*, No. 21-0037, 2021 WL 3074505, at *3 (Iowa Ct. App. July 21, 2021) ("Based on the [father's] conduct thus far, it is unlikely [he] would be able to resume care of the child after six months.").

Further, substance use was not the only concern with the father.  The father also has a significant history of mental-health struggles, which went largely unaddressed in this case.  This also supports our conclusion that a six-month extension is not warranted.  *See In re M.S.*, No. 23-0036, 2023 WL 2674100, at *4 (Iowa Ct. App. Mar. 29, 2023) (determining an extension of time was not warranted where "[t]he [father] ha[d] not fully addressed the problems that led to the removal of the child during the CINA proceedings").  And while the father did obtain a mental health evaluation shortly before the termination hearing, such an eleventh-hour effort is not sufficient to prevent termination.  *See In re K.A.*, No. 20-0979, 2020

WL 5946114, at *2 (Iowa Ct. App. Oct. 7, 2020) ("[T]he father's eleventh hour attempts do not warrant an extension of time or prevent termination of his rights.").

### 3. Guardianship

Lastly, the father argues the juvenile court should have established guardianship of the children with the paternal grandparents instead of terminating his parental rights. He contends "[t]his is a case where a guardianship is appropriate, as the children are older at ages 10 and 12, the children are placed with relatives, and a guardianship would give the children the stability they need, while allowing them to still have a relationship with their biological parents." We disagree that a guardianship was a viable alternative to termination in this case.

In limited circumstances, the juvenile court may establish a guardianship of a child with an adult relative in lieu of termination. *See* Iowa Code §§ 232.104(2)(d) (providing that the juvenile court may, after a permanency hearing, enter an order transferring guardianship and custody of the children to a suitable person), .117(5) (providing that the juvenile court may, after a termination hearing, decline terminating parental rights but instead enter an order in accordance with section 232.104). "To establish the guardianship, the court must determine by clear and convincing evidence that 'termination of the parent-child relationship would not be in the best interest of the child[ren].'" *In re T.M.*, No. 20-1163, 2020 WL 6482346, at *3 (Iowa Ct. App. Nov. 4, 2020) (alteration in original) (quoting Iowa Code § 232.104(4)(a)). But "a guardianship is not a legally preferable alternative to termination." *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017).

After careful consideration, we conclude that a guardianship is inappropriate in this case for two reasons. First, the father and the paternal

grandparents—the proposed guardians—do not have a good relationship. When asked whether he had any grievances with the children being placed with his parents, the father testified, "Yeah. And I have a lot of issues with [my mother] anyways because she's a mess." And when asked whether he believed his parents would be appropriate guardians, the father responded:

> I don't know anymore. I mean, I . . . Not with all the mental stuff that they're going through some issues now because of this. Because of [my mother]. Because of what has been said to them. It's going to take a lot of counseling to get them back to where they were before this. A lot.

(Ellipsis in original.)

Further, Matias testified that that there is currently a no-trespassing order in place between the father and his parents due to several hostile actions of the father during this case. This severely undermines our confidence that a guardianship is a viable alternative. *See A.S.*, 956 N.W.2d at 478 (noting the presence of "physical and verbal aggression" in the relationship between the parents and the potential guardian when concluding termination was in the child's best interest).

Second, the children have finally achieved much-needed stability while they have been placed with their paternal grandparents. By their very nature, guardianships can be changed or terminated. *See In re R.S.R.*, No. 10-1858, 2011 WL 441680, at *4 (Iowa Ct. App. Feb. 9, 2011) ("So long as a parent's rights remain intact, the parent can challenge the guardianship and seek return of the child to the parent's custody."). The children have been removed from the father's custody for nineteen months. In that time, their paternal grandparents provided a loving, caring, and stable home. The children wish to remain with their paternal grandparents, and all indications are that they will. These children deserve

permanency after suffering through years of trauma while in the custody of their parents. A guardianship would not be in the children's best interests. *See In re J.H.*, No. 16-1501, 2016 WL 6664984, at *1 (Iowa Ct. App. Nov. 9, 2016) ("Delaying permanency any further is not in the child[ren]'s best interests.").

Accordingly, we conclude the district court did not err by denying the father's request to establish a guardianship.

## C. Bifurcation of the Roles of GAL/Attorney for the Children

Finally, the mother and father both argue the district court erred by not bifurcating the roles of the children's joint GAL and attorney because of a conflict regarding their positions on termination. The mother and father assert the children's positions on termination were in conflict with their joint GAL and attorney's because they did not want to be adopted. However, we conclude there was no conflict that necessitated bifurcation of the roles of the children's joint GAL and attorney.

In *In re A.T.*, we held that the juvenile court erred by not ordering the bifurcation of the roles of a child's joint GAL and attorney because the child's views on termination clearly conflicted with the views of her joint GAL and attorney. 744 N.W.2d 657, 665 (Iowa Ct. App. 2007) ("When, however, a guardian ad litem recommends a disposition that conflicts with the juvenile's wishes, the juvenile court may . . . appoint independent counsel to represent the child in situations where a child is of sufficient age and maturity to make an informed decision about a potential termination . . . ."). Specifically, the child at issue did not want her mother's parental rights terminated, while her joint GAL and attorney advocated for termination. *Id.* at 660.

We believe the present case is distinguishable. Unlike the situation in *A.T.*, we see no conflict in the wishes of the children and the recommendation of their joint GAL and attorney. The children expressed to both Leighty and Matias that they were in favor of termination and wished to remain placed with their paternal grandparents. Further, Leighty specifically asked H.B. in front of the juvenile court if she was in favor of termination. H.B. responded in the affirmative by nodding her head. The only evidence the children were against termination came from testimony of the mother and father. But the juvenile court found their testimony to be lacking in credibility. And we defer to that finding. *See C.Z.*, 956 N.W.2d at 120.[7]

While H.B. did not wish to be adopted, such a desire is not inherently incompatible with termination. Adoption is often the preferable option for a child to achieve permanency following the termination of their parents' parental rights, but it is not necessary for termination. *See T.C.*, 522 N.W.2d at 109. And Leighty fully informed the juvenile court of H.B.'s wishes to not be adopted.

Accordingly, we find there was no conflict necessitating bifurcation of Leighty's role as joint GAL and attorney.

---

[7] We also question whether the logic of *A.T.* would be applicable to L.B., since she was only ten years old at the time of the termination hearing. *See* Iowa Code § 232.116(3)(b) (providing the juvenile court may decline terminating parental rights if the "child is *over* ten years of age and objects to termination" (emphasis added)). Further, there is scant evidence indicating her maturity level to voice her wishes. *See id.* § 232.116(2)(b) (providing that in considering termination, the juvenile court may consider "[t]he reasonable preference of the child, *if* the court determines that the child has sufficient capacity to express a reasonable preference" (emphasis added)).

## IV.    Conclusion

In sum, we affirm the juvenile court's order terminating the mother and father's parental rights.

**AFFIRMED ON BOTH APPEALS.**